# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| FIRSTENERGY SOLUTIONS CORP. | : | CIVIL ACTION |
|---|---|---|
| v. | : | |
| | : | NO. 16-694 |
| ALLEGHENY LUDLUM LLC | : | |

**KEARNEY, J.**                                              April 13, 2017

## MEMORANDUM

Businesses properly rely on federal courts consistently interpreting their contractual obligations. Lawyers are trained to promptly address and resolve disputes on contract terms to allow their client businesses move on to their highest goal of achieving value for their owners and constituencies. A purchaser who disputes a bill should promptly seek judicial resolution. If it believes it has a valid defense to payment, the purchaser should not voluntarily pay the bill, sit silently for over a year and then, as the contract expires, simply deduct the amount viewed as overpaid a year earlier. Under the parties' chosen Ohio law, the doctrine of voluntary payment bars the purchaser from paying the bill in full under some form of informal protest and then later simply deducting from the final bill without judicial direction. In the accompanying Order, we apply these time-tested principles of Ohio law and grant the seller's motion for summary judgment requiring the purchaser to pay the last bill in full.

### I. Background[1]

Allegheny Ludlum LLC is Pittsburgh steel and metal manufacturer relying on electricity to operate its four plants in Western Pennsylvania and one plant in Ohio.[2] FirstEnergy Solutions Corporation provides electricity to businesses and residences. Allegheny Ludlum and

FirstEnergy negotiated a deal for Allegheny Ludlum to purchase electric from FirstEnergy.

### A. The Agreement

On November 19, 2010, Allegheny Ludlum and FirstEnergy signed a "Customer Supply Agreement" requiring FirstEnergy to provide electricity for Allegheny Ludlum's five plants.[3] The parties agreed the Agreement expired in December 2015.[4] The parties agreed upon venue in Pennsylvania and Ohio law would govern disputes.[5]

The parties agreed Allegheny Ludlum would purchase electricity from FirstEnergy under two slightly different methods, one for its four Pennsylvania plants and one for its Ohio plant.[6] For the Ohio plant, the parties agreed to "Fixed Price Pricing Attachment" which established a fixed price per kWh Allegheny Ludlum would pay for electricity used.[7] For the Pennsylvania plants, Allegheny Ludlum would purchase electricity in "blocks" and if Allegheny Ludlum exceeded the "block" amount, it could purchase additional electricity under an agreed upon pricing index.[8] This information is included in Exhibit B to the Agreement, including how to calculate the "block" electricity and one factor is the "LMP Adder."[9] The "LMP Adder" contemplates charges from the independent regional transmission organization ("RTO") which "manages the high-voltage electricity grid to ensure reliability for more than 61 million people."[10] The RTO is not a party to the Agreement and is independent from FirstEnergy and Allegheny Ludlum.[11] Under the Agreement, FirstEnergy would bill Allegheny Ludlum for the energy supplied on a monthly basis.[12]

### B. The January 2014 events leading to the RTO surcharges.

On January 6-8, 2014, Western Pennsylvania and Ohio experienced a "prolonged, deep cold" with record low temperatures.[13] The deep freeze caused a rise in demand for heating and caused the RTO's energy reserves to fall below its requirements.[14] Also due to the increased

2

demand, the RTO's energy grid had "significant, unplanned" outages from equipment failures in its power plants.[15] The RTO ordered additional power plants to be brought online.

Weather agencies forecasted very cold temperatures and winter storms for January 17-29.[16] The RTO ordered additional power plants be brought online to avoid outages and needed to purchase additional expensive gas units to do so.[17] On January 23, 2014, the RTO filed a waiver with the Federal Energy Regulatory Commission to "allow for make-whole (uplift) payments for the difference between the capped price and the marginal costs for generating energy that exceeded the $1,000/MWh cap" of the operating agreements.[18]

The cold and storms did not present as severe as expected.[19] The consumer demand for energy was also not as high as expected and "energy market prices never exceeded the old $1,000 generation resource offer cap in the second half of January."[20] The RTO's measures to activate and run the additional power plants during these two time periods cost an estimated $600 million dollars.[21] The RTO passed the January 2014 ancillary charges onto its member utilities, including FirstEnergy, under their agreements.

On March 19, 2014, FirstEnergy informed Allegheny Ludlum during the month of January 2014 the RTO "incurred extremely high ancillary costs" to add the additional power plants and invoiced these high ancillary costs, referred to as an "RTO surcharge," to FirstEnergy.[22] FirstEnergy explained this RTO surcharge is a "Pass-Through Event" under the Agreement and FirstEnergy would adjust Allegheny Ludlum's "electric generation costs" for January would be adjusted to include this "Pass-Through Event" charge.[23] FirstEnergy anticipated the charge would be "approximately 1-3 percent" of Allegheny Ludlum's annual electric generation expenditure and the charge will be in a bill "rendered after April 15, 2014."[24] The letter then states in bold this is "a notification of the Pass-Through Event and that the

3

additional costs and charges will be reflected in future electric bills."[25]

FirstEnergy included the first RTO surcharge of $25,999.86 charge in the June 4, 2014 bill for Allegheny Ludlum's Ohio plant.[26] On July 1, 2014, Allegheny Ludlum told FirstEnergy its withholding $25,999.86 from the bill and demanding a corrected invoice.[27] FirstEnergy, through counsel, asserted its charge is proper and it would collect unpaid charges.[28]

On July 17, 2014, FirstEnergy included the RTO surcharge for the four Pennsylvania plants: (1) $37,570.41 for Latrobe; (2) $401,772.64 for Brackenridge/Vandergrift; $23,115.48 for Washington; and, (4) $16,174.22 for Houston.[29] FirstEnergy billed Allegheny Ludlum $504,632.61 in total for the additional ancillary costs imposed by the RTO.[30] Allegheny Ludlum refused to pay these additional charges in its June and July bills because it did not believe FirstEnergy could pass through the RTO surcharge under the Agreement.

On November 11, 2014, FirstEnergy sent Allegheny Ludlum five invoices for the RTO Expense Surcharge Invoice with the past due amounts totaling $503,632.61.[31] The invoices also warned if Allegheny Ludlum does not pay within thirty days its "service with FirstEnergy Solutions will be cancelled."[32] On November 19, 2014, Allegheny Ludlum decided to pay the charges "to protect the remaining value of the [Agreement] until it expires in December 2015.[33]

On December 3, 2014, Allegheny Ludlum sent five separate wires totaling $504,632.61 to FirstEnergy.[34] Allegheny Ludlum's counsel simultaneously sent a letter by email and overnight delivery to FirstEnergy and FirstEnergy's outside counsel stating it submitted the payment under protest and paid only "to avoid [FirstEnergy]'s cancellation of the Agreement."[35]

Over a year later, FirstEnergy issued Allegheny Ludlum its final invoices under the Agreement expiring in December 2015.[36] FirstEnergy billed for energy provided in Fall 2015 entirely unrelated to the RTO surcharges Allegheny Ludlum paid fourteen months earlier.[37]

4

FirstEnergy invoiced $142,222.08 for the Ohio plant and $2,777,799.84 for the four Pennsylvania plants.[38]

Allegheny Ludlum unilaterally short-paid $504.632.61 on the last invoice under the Agreement.[39] It simply decided to not pay the money it believed it did not owe, as a matter of law, on December 3, 2014. FirstEnergy sent written demands for the $504,632.61 and Allegheny Ludlum refused to pay.[40] On May 27, 2016, FirstEnergy sued Allegheny Ludlum for the unpaid balance of the December 2015 invoices. The parties cross moved for summary judgment.[41]

## II. Analysis

FirstEnergy moves for summary judgment arguing Allegheny Ludlum breached the Agreement by short-paying the final invoice and waived its defense by voluntarily paying the RTO surcharges on December 3, 2014. Allegheny Ludlum moves for summary judgment arguing FirstEnergy should not have imposed the RTO surcharges under the Agreement. We find in favor of FirstEnergy's breach of contract claim because Allegheny Ludlum voluntarily paid the disputed RTO surcharge and breached the Agreement by withholding $504,632.61 from the last invoice due to FirstEnergy.[42] Allegheny Ludlum's declaratory judgment claim is denied.

### 1. Allegheny Ludlum impermissibly short-paid FirstEnergy's final invoice by $504,632.61.

Allegheny Ludlum breached the Agreement with FirstEnergy by withholding $504,632.61 from FirstEnergy's December 2015 invoice. Allegheny Ludlum does not dispute the $504,632.61 is for energy services provided by FirstEnergy in Fall 2015. The December 2015 invoice is unrelated to the RTO surcharges Allegheny Ludlum voluntarily paid in December 2014 even though it believed it had no legal right to pay. While Allegheny Ludlum's dispute of the RTO surcharges may have been valid in 2014, we do not reach its merits because

5

under strict Ohio law, Allegheny Ludlum waived the dispute by voluntarily paying the charges.[43] Allegheny Ludlum must remit the unpaid $504,632.61 balance and interest from the December 2015 invoice to FirstEnergy.

### A. Allegheny Ludlum's voluntary payment of the RTO surcharges.

Allegheny Ludlum believed, as a matter of law, FirstEnergy could not pass through the RTO surcharge onto it under the Agreement but it paid the RTO surcharges under protest. Allegheny Ludlum's legal counsel wrote to FirstEnergy and its outside counsel regarding the payments under protest. Allegheny Ludlum did not invoke legal process to assert its right to restitution of the RTO surcharge. Allegheny Ludlum waited one year and two months until the Agreement expired making its relationship with FirstEnergy no longer commercially useful and short-paid FirstEnergy the amount of the RTO surcharge it voluntarily paid. Even at this juncture, Allegheny Ludlum did not sue FirstEnergy for declaratory judgment or restitution over the RTO surcharge. Instead, Allegheny Ludlum waited for FirstEnergy to hale it into court.

Ohio law, selected by the parties, strictly applies the voluntary payment doctrine.[44] Under Ohio's voluntary payment doctrine, "a person who voluntarily pays another to full knowledge of the facts will not be entitled to restitution."[45] In *Salling*, plaintiff rented a car from Budget for one day.[46] The plaintiff drove 64 miles, re-filled the car with gas, and returned it to Budget.[47] Budget charged him a refueling charge even though plaintiff returned the car with a full tank because under Budget's policy if a renter drives a car less than 75 miles, the renter must refill the tank and submit a receipt.[48] Plaintiff paid the refueling charge specifically "in anticipation of filing suit" then filed a class action lawsuit against Budget claiming the refueling charge breached his contract with Budget.[49]

6

The Court of Appeals found plaintiff voluntarily paid the refueling charge to Budget.[50] The court looked to the Ohio Supreme Court holding "[i]n the absence of fraud, duress, compulsion or mistake of fact, money, voluntarily paid by one person to another on a claim of right to such payment, cannot be recovered merely because the person who made the payment mistook the law as to his liability to pay."[51] The Court of Appeals found plaintiff knowingly paid the charge believing it breached the contract to have standing to file his class action against Budget.[52] The court also held plaintiff's argument the voluntary payment doctrine does not apply to breach of a written contract is incorrect because "[a] payment made by reason of a wrong construction of the terms of the contract is not made under a mistake of fact, but under a mistake of law, and if voluntary cannot be recovered back."[53]

Allegheny Ludlum must pay FirstEnergy because the voluntary payment doctrine bars Allegheny Ludlum's right to keep the $504,632.61 it improperly withheld. When Allegheny Ludlum paid the RTO surcharge it believed FirstEnergy did not have the right to pass the surcharge through under the Agreement as in *Salling*, where the plaintiff believed Budget's surcharge breached their contract when he paid it.[54] Allegheny Ludlum's payment under protest is different from *Salling* where there appears no evidence plaintiff paid Budget "under protest." Although we find it difficult to imagine how an average consumer would pay Budget under protest (short of bringing a checkbook), Allegheny Ludlum disputed the charge to FirstEnergy and consulted its in-house counsel whether the Agreement permitted the charge. After FirstEnergy refused to remove the RTO surcharge, Allegheny Ludlum evaluated the worth of the Agreement and decided to pay it.

Allegheny Ludlum's RTO payments were not made under duress and compulsion because Allegheny Ludlum weighed its options and decided not to terminate the Agreement with

7

FirstEnergy or file suit against FirstEnergy. Under Ohio contract law, economic duress requires Allegheny Ludlum demonstrate "(1) that it involuntarily accepted the terms of another; (2) that under the circumstances it had no other reasonable alternative; and, (3) that the circumstances were a product of coercive actions on the party of the opposite party."[55] Allegheny Ludlum did not suffer duress because it admits to consulting its attorneys and measuring the economic benefit of the Agreement versus terminating over refusal to pay the RTO surcharge and return to likely more expensive utility service. There is no evidence FirstEnergy engaged in coercive actions; it believed Allegheny Ludlum owed the RTO surcharge under the Agreement and enforced its contractual right to demand payment or cancel the contract.[56]

Allegheny Ludlum's payment under protest is not an exception to the voluntary payment doctrine. Ohio recognizes fraud, duress, compulsion, or mistake of fact as valid exceptions to the voluntary payment doctrine.[57] The Third Edition of Ohio Jurisprudence explains "[a] protest does not render a payment involuntary....[t]he function of a protest is only to evidence the party's intention at the time the payment is made, and when, independently of the protest, the circumstances of payment would not justify a recovery of the payment, the fact that it was made under protest will not render such payment involuntary."[58] Allegheny Ludlum's protest failed to render its RTO surcharge payment involuntary. It only served to notify First Energy of its intent, particularly when Allegheny Ludlum never used legal process to assert its protest.

We are aware the cases supporting the Ohio jurisprudence are from the late Ninetieth and early Twentieth Century and Allegheny Ludlum argues this lessens their precedential value. We disagree. Both parties are unable to locate a more recent case overruling or criticizing these cases and other courts, including the Court of Appeals and Ohio appellate courts, look to this precedent in voluntary payment doctrine cases.[59] Taking Ohio's jurisprudence together, if the

8

Ohio Supreme Court faced these facts consistent with precedent, it would find Allegheny Ludlum's payment under protest does not change its payment from voluntary to involuntary under the doctrine and bars restitution.

### B. Allegheny Ludlum's conduct after voluntary payment of the RTO surcharges.

Even if we assume the Ohio Supreme Court would find a protest rendered a party's payment involuntary, Allegheny Ludlum's conduct since the RTO surcharge payments waived its protest and withholding of the $504,632.61 from the December 2015 invoice breached the Agreement with FirstEnergy.

What is striking about the out-of-state cases Allegheny Ludlum cites in support of its argument is the party who paid under protest brought suit to vindicate its rights.[60] Allegheny Ludlum did not bring suit against FirstEnergy to vindicate its protest. Allegheny Ludlum did nothing for 14 months (except economically benefit from the Agreement). Allegheny Ludlum knew other FirstEnergy industrial and commercial consumers formed a coalition and filed a complaint with the Pennsylvania Public Utility Commission but Allegheny Ludlum did not elect to join or to bring its own lawsuit.[61] The Agreement expired. Allegheny Ludlum again did not seek legal process to vindicate its protested payment. Instead, it resolved its protest extra-judicially by withholding the protested amount from an unrelated FirstEnergy bill.

After withholding payment, Allegheny Ludlum still did not seek legal process, it allowed FirstEnergy to attempt collection and then waited for FirstEnergy to file suit. The Restatement (Third) of Restitution & Unjust Enrichment, which Allegheny Ludlum urges us to follow, states the payment under protest doctrine allows a party "rather than to insist on an immediate test" to "preserve a claim in restitution to recover the value of the conferred."[62] Allegheny Ludlum never exercised its preserved claim in restitution after declining an "immediate test" of their

9

dispute. Instead, it avoided initiating judicial resolution of its "preserved claim" altogether until sued. Allegheny Ludlum's conduct does not fit under the Restatement's "common-sense solution" to "promote justice and efficiency."[63]

Even if Ohio law recognized a payment under protest exception to the voluntary payment doctrine, Allegheny Ludlum's conduct in protesting but never seeking judicial resolution for its protests and waiting 14 months to take extra-judicial action to recover the protested payments waived Allegheny Ludlum's protest. Allegheny Ludlum breached the Agreement with FirstEnergy by withholding $504,632.61 from the December 2015 invoice for unrelated charges Allegheny Ludlum voluntarily paid.

## III. Conclusion

We grant summary judgment in favor of FirstEnergy's breach of contract claim because Allegheny Ludlum voluntarily paid the disputed RTO surcharge and breached the Agreement by withholding the $504,632.61 unpaid balance due on FirstEnergy's final invoice. FirstEnergy's claims for unjust enrichment and action on accounts are dismissed as moot. We deny Allegheny Ludlum's motion for summary judgment.

---

[1] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Dr. Engle, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. FirstEnergy filed its Statement of Undisputed Material Facts and Appendix at ECF Doc. No. 58. Allegheny Ludlum responded to FirstEnergy's Statement of Undisputed Facts at ECF Doc. No. 62. Allegheny Ludlum filed its Statement of Undisputed Material Facts and Appendix at ECF Doc. No. 60. FirstEnergy responded to Allegheny Ludlum's Statement of Undisputed Material Facts and Appendix at ECF Doc. No. 65. FirstEnergy added documents to the Appendix at ECF Doc. Nos. 71.

[2] ECF Doc. No. 65 ¶ 3.

³ *Id.* ¶ 10.

⁴ ECF Doc. No. 58 ¶ 31.

⁵ ECF Doc. No 58-1 at 24, 26.

⁶ *Id.* ¶¶ 19-20.

⁷ ECF Doc. No. 65 ¶ 22.

⁸ *Id.* ¶ 24.

⁹ ECF Doc. No. 58-1 at 30.

¹⁰ ECF Doc. No. 61 at 2 n. 1.

¹¹ *Id.*

¹² ECF Doc. No. 58-1 at 22.

¹³ ECF Doc. No. 65 ¶ 37.

¹⁴ *Id.* ¶¶ 38-39.

¹⁵ *Id.* ¶¶ 40-41.

¹⁶ *Id.* ¶ 48.

¹⁷ *Id.*; ECF Doc. No. 60-1 at 69.

¹⁸ *Id.*

¹⁹ ECF Doc. No. 65 ¶ 49.

²⁰ ECF Doc. No. 60-1 at 29, 69.

²¹ ECF Doc. No. 65 ¶ 50.

²² ECF Doc. No. 60-2 at 66.

²³ *Id.*

²⁴ *Id.*

²⁵ *Id.*

²⁶ ECF Doc. No. 65 ¶¶ 32, 96.

²⁷ ECF Doc. No. 58 ¶ 47.

²⁸ *Id.* ¶ 48.

²⁹ ECF Doc. No. 65 ¶¶ 33, 96.

³⁰ *Id.* ¶34.

³¹ ECF Doc. No. 58 ¶ 52.

³² *Id.* ¶ 53.

³³ *Id.* ¶ 55.

³⁴ *Id.* ¶ 61.

³⁵ ECF Doc. No. 58-1 at 324.

³⁶ ECF Doc. No. 58 ¶ 31.

³⁷ *Id.*

³⁸ *Id.* ¶¶ 31-32.

³⁹ *Id.* ¶ 34.

⁴⁰ *Id.* ¶ 39.

⁴¹ Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle*, 435 F.3d at 264 (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt*

*v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[42] We dismiss FirstEnergy's unjust enrichment and action on account stated claims as mooted by our finding Allegheny Ludlum breached the Agreement. We will address the 1.5% interest per month late payment charges Allegheny Ludlum owes FirstEnergy under Section 17 of the Agreement in a separate petition under our accompanying Order. ECF Doc. No 58-1 at 23.

[43] It is arguable Allegheny Ludlum's dispute with the November 11, 2014 invoice had merit in 2014 or if Allegheny Ludlum did not waive their dispute. The RTO surcharges may be a statistical anomaly but it does not make them a "Pass-Through Event" but a standard (albeit unusually high) ancillary service charge under the Agreement. The Agreement covering the four Pennsylvania plants includes a fixed negotiated price for the RTO's ancillary service charges and FirstEnergy cannot pass the RTO surcharge from January 2014 onto Allegheny Ludlum. The LMP Adder in the pricing formula "includes ancillary service charges…and regulatory requirements…" ECF Doc. No 58-1 at 24, 26. The Agreement allows the parties to renegotiate the fixed LMP Adder for the years 2014 and 2015 when the current 0.1705 LMP Adder expires. *Id.* at 33. Viewing the Agreement as a whole, the LMP Adder is a negotiated fixed charge which includes ancillary services. The fixed LMP Adder covered the RTO surcharge from the January 2014 weather events. The LMP Adder includes ancillary services costs. *Id.* at 292. FirstEnergy and the RTO described the January 2014 RTO surcharge as ancillary service charges. The RTO's ancillary service charge is a standard charge included in the LMP Adder which became extraordinarily high in January 2014. For the Ohio plant, the Fixed Pricing addendum fixes a single price Allegheny Ludlum would pay for energy from FirstEnergy. The fixed price is without qualification or caveat. Generally, "fixed" means "fixed" and the ancillary services charges from January 2014 cannot be passed onto Allegheny Ludlum.

It is also possible Allegheny Ludlum could have been correct in disputing the RTO surcharge is not a "Pass-Through Event" under the Agreement. The Agreement's "new or additional" charges language is clear: the "Pass-Through Event" must be "associated with environmental or Energy law and regulations." Breaking the language out piece by piece, we start with a list of actors who initiate the change. Then we have two types of changes they might initiate: (1) the actors may "require a change to the terms of the Agreement"; or (2) "impose upon Supplier new or additional charges or requirements, or a change in the method or procedure for determining charges or requirements." For option two, the Agreement describes the types of charges which the actors might impose upon FirstEnergy. Those charges "include[ed] but not limited to material changes to existing or material new charges, fees, costs, credits, emission allowance requirements, permitting requirements and/or obligations *associated with environmental or Energy law and regulation*…." The Agreement gives specific examples of charges associated with environmental or Energy law and regulation "such as, alternative energy requirements, carbon and greenhouse gas, or other similar controls." These charges must be associated with environmental or Energy law and regulation must be "relat[ed] to the Electricity Supply under this Agreement." If all these steps are met, there is a "Pass-Through Event" under the Agreement.

We have a proper actor for step one because there is a regional transmission organization. The

surcharge is a charge imposed by RTO, so we look to the second option. We assume for the moment the surcharge is a "new or additional charge" the RTO imposed on FirstEnergy and not a standard ancillary service charge. We then have a non-exhaustive list of items which are all items tied together by the final descriptor "associated with environmental or Energy law and regulation."

There is no evidence the RTO surcharge from the January 2014 cold weather is "associated with environmental or Energy law and regulations." FirstEnergy's letter to Allegheny Ludlum does not mention any law or regulation which caused the RTO to impose the charges on FirstEnergy. *See* ECF Doc. No. 60-2 at 66. Instead, FirstEnergy cites the high costs the ETO paid to purchase more energy reserves to keep up with heating needs generated by the extreme cold and avoid outages. *See id.* The RTO surcharge the RTO imposed on FirstEnergy cannot be passed onto Allegheny Ludlum because it is a standard ancillary service charge, not a "Pass-Through Event" because it is not associated with a legal or regulatory action; it is associated with incredibly cold weather.

[44] FirstEnergy's voluntary payment doctrine is properly before us. FirstEnergy did not raise it as an affirmative defense to Allegheny Ludlum's counterclaim; however, the facts underlying the voluntary payment doctrine are raised in Allegheny Ludlum's Answer. ECF Doc. No. 38 at 2. "Allegheny Ludlum paid the disputed amounts under protest….when the Supply Agreement terminated, Allegheny Ludlum exercised its right to a set-off." Similarly, in *Salling*, Budget did not raise voluntary payment doctrine defense until its summary judgment reply brief but the Court of Appeals did not find the defense waived because district court fully addressed the issue in its summary judgment ruling and the parties fully briefed the issue on appeal. *See Salling v. Budget Rent-A-Car Systems, Inc.*, 672 F.3d 442, 442 (6th Cir. 2012). The parties conducted discovery and agreed to the undisputed facts supporting the voluntary payment doctrine. FirstEnergy raised the defense when it moved for summary judgment and Allegheny Ludlum responded fully to FirstEnergy's arguments. The voluntary payment doctrine is fully briefed by the parties and we address it.

[45] *Wears Kahn McMenamy & Co. v. JPMorgan Chase Bank, N.A.*, No. 12-812, 2013 WL 1689030 at (S.D. Ohio April 18, 2013) (quoting *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 894 (S.D. Ohio 2003)).

[46] *Salling*, 672 F.3d at 442.

[47] *Id.* at 443.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 445.

[51] *Id.*

⁵² *Id.*

⁵³ *Id.* at 445 (quoting *Nationwide Life Ins. Co. v. Myers,* 67 Ohio App.2d 98, 425 N.E.2d 952, 956 (1980) (quoting *Cincinnati v. Cincinnati Gaslight & Coke Co.*, 41 N.E. 239, at syllabus para. 3 (1895))).

⁵⁴ *See id.* at 445.

⁵⁵ *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 933 F. Supp. 2d 974, 1006 (S.D. Ohio 2013) (internal citations omitted). Ohio courts assess economic duress and economic compulsion together. *See Morana v. Foley*, 54 N.E. 3d 749, 754 (Ohio App. 2015) ("duress is denoted by a compulsion that leaves no alternative but to assent to the terms offered by a person making the threat"). There is no allegation FirstEnergy held any of Allegheny Ludlum's goods or persons when demanding payment so physical compulsion does not apply.

⁵⁶ As detailed in n. 49 *supra*, Allegheny Ludlum's dispute with FirstEnergy is a legal dispute over the construction of the Agreement and the voluntary payment doctrine under Ohio law excludes mistake of law exceptions.

⁵⁷ *See id.*

⁵⁸ 73 Ohio Jur. 3d Payment and Tender § 65 (2017).

⁵⁹ *Salling*, 672 F.3d at 444 and *Nationwide Life Ins. Co. v. Myers*, 425 N.E. 2d 952, 956 (1980) (both citing *Cincinnati v. Cincinnati Gaslight & Coke Co.*, 41 N.E. 239 (Ohio 1895)).

⁶⁰ *See e.g., Avianca, Inc. v. Corriera*, No. 85-3277, 1992 WL 93128 at *7 (D.D.C. April 13, 1992)(plaintiff and plaintiff's subcontractor protested payments to defendant then brought suit); *Cmty. Convalescent Ctr., Inc. v. First Interstate Mortg. Co.*, 537 N.E. 2d 1162, 1164 (Ill. App. Ct. 1989) (plaintiff paid interest under protest then brought suit).

⁶¹ ECF Doc. No. 58-1 at 463-64.

⁶² Restatement (Third) of Restitution & Unjust Enrichment § 35 (2011).

⁶³ *Id.* at § 35 (Comment a.).

15